# In The Matter Of:
## *Wynter Whitley, Christopher Kitcho v. Officer M.L. Hill, et al*

*Richard A. Mason*
*July 18, 2017*

*Moon Reporting Service, Inc.*
*1516 Bruxton Court*
*Loganville, Georgia  30052*
*770-314-2952*
*patmoon@bellsouth.net*

Original File 071817-RM.txt
Min-U-Script® with Word Index

Wynter Whitley, Christopher Kitcho vs.
Officer M.L. Hill, et al

Case 1:16-cv-03192-LMM   Document 57-3   Filed 11/01/17   Page 2 of 15

Richard A. Mason
July 18, 2017

Page 3

```
                                                        Page 3
 1    IN THE UNITED STATES DISTRICT COURT          1              I N D E X
 2    FOR THE NORTHERN DISTRICT OF GEORGIA         2   RICHARD A. MASON
              ATLANTA DIVISION                          Direct Examination by Ms. Harlow........ Page  5
 3                                                 3    Cross-Examination by Mr. Greenamyre..... Page 27
   WYNTER WHITLEY,                )                     Redirect Examination by Ms. Harlow...... Page 52
 4 CHRISTOPHER KITCHO,            )                4
                                  )                                - - -
 5       Plaintiffs,              )                5
                                  ) CIVIL ACTION FILE
 6 vs.                            )                6
                                  ) NUMBER 1:16-cv-03192-LMM
 7 OFFICER M.L. HILL, in          )                7
   his individual capacity,       )
 8 OFFICER C.L. BROWN, in         )                8
   his individual capacity,       )
 9 SERGEANT S. DEAN, in his       )                9
   individual capacity,           )
10                                )               10
         Defendants.              )
11                                                11
12                                                12
13         DEPOSITION OF                          13
14         RICHARD A. MASON                       14
15                                                15
16     Tuesday, July 18, 2017                     16
17         9:00 a.m.                              17
18       At the offices of                        18
19   DeKalb County Law Department                 19
     1300 Commerce Drive, 5th Floor
20     Decatur, Georgia  30030                    20
21 Patricia M. Moon, CCR No. B-1078               21
     Certified Court Reporter
22                                                22
23   MOON REPORTING SERVICE, INC.                 23
24      1516 Bruxton Court                        24
     Loganville, Georgia  30052
25        770-314-2952                            25
       patmoon@bellsouth.net
```

```
                            Page 2                           Page 4
 1      A P P E A R A N C E S              1         E X H I B I T S
 2                                         2  Defendant's                           Page
   On Behalf of the Plaintiffs:               Exhibit                               Marked
 3                                         3
     JEFFREY R. FILIPOVITS                    No. 1   Text Messages..............    15
 4   Attorney at Law                       4
     Filipovits Law Firm, PC                  No. 2   Incident Report 9/29/14 at
 5   2900 Chamblee-Tucker Road             5          0430 by M.J. Condland.......    21
     Building 1
 6   Atlanta, Georgia  30341               6  No. 3   Incident Report 9/29/14 at
     770-455-1350                                     1500 by M.A. Olson..........    22
 7   Email: jrfilipovits@gmail.com         7
                                              No. 4   Narcotics Case File.........    25
 8   ZACK W. GREENAMYRE                    8
     Attorney at Law                                       - - -
 9   Mitchell & Shapiro, LLP               9
     3490 Piedmont Road
10   Suite 650                            10
     Atlanta, Georgia  30305
11   404-812-4740                         11  Plaintiff's                           Page
     zack@mitchellshapiro.com                 Exhibit                               Marked
12                                        12
   On Behalf of the Defendants:               No. 1   Affidavit and Application for
13                                        13          Search Warrant and Related
     TIFFANY B. HARLOW                                Documents...................    35
14   Assistant County Attorney            14
     KENDRIC E. SMITH                                      - - -
15   Senior Assistant County Attorney     15
     DeKalb County Law Department
16   1300 Commerce Drive, 5th Floor       16
     Decatur, Georgia  30030
17   404-371-3011                         17
     Email: tbharlow@dekalbcountyga.gov
18          kesmith@dekalbcountyga.gov    18
19                                        19
20                                        20
21                                        21
22                                        22
23                                        23
24                                        24
25                                        25
```

Wynter Whitley; Christopher Kitcho v.
Officer M.L. Hill, et al
Case 1:16-cv-05192-LMM   Document 57-3   Filed 11/01/17   Page 3 of 15
Richard A. Mason
July 18, 2017

**Page 5**

1  PROCEEDINGS
2  MS. HARLOW: You can swear Mr. Mason.
3  (Witness duly sworn.)
4  MS. HARLOW: This deposition is being taken
5  for the purpose of discovery and all other
6  permissible purposes under the Federal Rules of
7  Civil Procedure.
8  Are we going to reserve all objections as
9  to the form of the question and responsiveness
10 of the answer?
11 MR. GREENAMYRE: Yes.
12 RICHARD A. MASON,
13 being first duly sworn, was examined and testified as
14 follows:
15 DIRECT EXAMINATION
16 BY MS. HARLOW:
17 Q  All right. You have the opportunity after
18 this is over to come back here, read over your
19 deposition, and sign it or you can waive that. Ms.
20 Moon is very good at her job. So unless you feel like
21 she's gonna make a whole bunch of errors --
22 A  I'll trust her.
23 Q  Okay. So you'll waive?
24 A  I'll waive.
25 Q  Okay. Go ahead and say your name for the

**Page 6**

1  record for me.
2  A  Captain Richard A. Mason, M-A-S-O-N.
3  Q  And who is it that you work for?
4  A  City of Atlanta Police.
5  Q  And how long have you been with the City of
6  Atlanta?
7  A  A little over 24 years.
8  Q  What is your title with the City of Atlanta?
9  A  Captain.
10 Q  How long have you been a captain?
11 A  Almost two years.
12 Q  Okay. Prior to that, what was your title?
13 A  I was a lieutenant in the Narcotics Unit.
14 Q  Okay. Great. I'm gonna ask you some
15 questions today about the plaintiff in this case Mr.
16 Christopher Kitcho. How do you know Mr. Kitcho?
17 A  I knew of him before I actually supervised
18 him. When I created an Auto Theft Unit, he was placed
19 under my supervision and that would have been
20 approximately seven years ago.
21 Q  Was he fairly new to the police department at
22 that time?
23 A  By new he wasn't a rookie, but he wasn't a
24 veteran. He'd had enough time on to go to the Motors
25 Unit.

**Page 7**

1  Q  Okay. Do you know where he had been before
2  he came to you in that unit?
3  A  No.
4  Q  What was your general -- what did you know
5  about him and his job performance before he came to you
6  or at the time he came to you? I'm sorry.
7  A  He was very high strung, maybe a little
8  flighty with decision making, and it was never actually
9  verbalized; but when Chief Findley was still with
10 Atlanta before leaving, he moved him to Auto Theft for
11 me to kind of keep an eye on him and kind of teach him
12 how to be the police. So when I left Auto Theft two
13 years later and went to Narcotics, miraculously
14 Christopher Kitcho came to Narcotics with me as well.
15 Q  Okay. And how was your time kind of teaching
16 him how to be police so to speak?
17 A  Young, energetic, gung-ho, loved being on the
18 streets, loved getting into things. Paperwork wasn't
19 as articulate as it could have been. He was an average
20 officer.
21 Q  Did you ever start to notice any sorts of
22 changes in him or his demeanor on the job?
23 A  When he was in Narcotics.
24 Q  And what changes did you notice?
25 A  Physical appearance, flustered, bright red,

**Page 8**

1  profuse sweating. At one point I was in a back hallway
2  and Mr. Kitcho walked by me and I looked down and he
3  didn't speak, which was unusual, but I noticed a look
4  about him and I immediately went to the sergeant and
5  asked him to take him down to Internal Affairs and have
6  him drug tested. Based on 19 years experience with
7  working Narcotics, he clearly was showing all of the
8  signs of some type of abuse. The sergeant called him
9  into the office and Mr. Kitcho proceeded to tell him he
10 hadn't been sleeping well, that he was taking
11 medications for something, and was ill and convinced
12 the sergeant that it was nothing more than his lack of
13 rest.
14 Q  So he didn't take the drug test?
15 A  So the sergeant did not take him down to drug
16 test him.
17 Q  Okay. Was he back on the job after that?
18 Did you keep him on?
19 A  He was. And he straightened up a little bit,
20 and then shortly after that incident is when this took
21 place in DeKalb County and he was mandated to go down
22 and test.
23 Q  So let's talk about the day of this incident.
24 At the time of the incident that makes up this lawsuit,
25 he was working under you in Narcotics, Mr. Kitcho?

**Page 9**

1  A  Prior to this.
2  Q  Okay.
3  A  Yes.
4  Q  And about how long prior to this, before this
5  happened, did he stop working with you?
6  A  This was about a week or two after he
7  resigned and before that he was on administrative leave
8  for a drug test which would have been another probably
9  six weeks.
10  Q  Okay. So let's go all the way to that six
11  weeks time.
12  A  Uh-huh.
13  Q  What was he drug tested for? What was the
14  reason for that?
15  A  Internal Affairs called me and said that they
16  had received a tip that he was utilizing illegal
17  narcotics and they were calling him down for a test.
18  Q  Okay. And did he go to that?
19  A  Yes. That's mandatory.
20  Q  Okay. And what -- and to your knowledge,
21  what was the result of that?
22  A  I picked him up. I drove him to Internal
23  Affairs. He was very quiet. We drove to Concentra
24  which is where the actual urine test would be
25  collected, and he was sitting behind me. Sergeant

**Page 10**

1  Carrie Mills, retired, was his rep, his I guess union
2  rep; and when she exited the car, he started to get
3  out, stopped, and said, LT, if someone slipped me some
4  Molly last night, am I gonna -- excuse my French. Am I
5  gonna piss hot? I said, of course, you are. What
6  makes you think you had Molly last night? Well, I was
7  at a club and I was drinking and they may have slipped
8  some Molly in my, in my drink.
9  Q  And for -- just for the record, what does
10  piss hot mean?
11  A  Test positive for illegal drugs.
12  MR. SMITH: What is Molly?
13  BY MS. HARLOW:
14  Q  And for Mr. Smith's edification, what is
15  Molly?
16  A  Molly is MDMA or Ectasy.
17  Q  Okay. So you asked him why would you think
18  someone slipped you something and what did he say to
19  that?
20  A  He didn't comment; and I asked him, Kitcho,
21  why didn't you call me the minute this occurred because
22  that could have protected you? I don't know. I just
23  fucked up. He walks into Concentra. I sat there for
24  about two and a half hours because he could not
25  urinate. He drank approximately one gallon of water

**Page 11**

1  before he was able to provide a sample, and we waited
2  for the test results.
3  Q  Did he go back to work after this drug test?
4  A  No.
5  Q  Okay. He was put on leave?
6  A  Administrative suspension.
7  Q  Okay. And that's mandatory?
8  A  Yes.
9  Q  And required when you take a drug test?
10  A  Yes.
11  Q  Okay. And how long was he supposed to be on
12  leave for?
13  A  Until the test results come back, which the
14  first results came back and then you have the option of
15  having them retest a second sample.
16  Q  Okay.
17  A  So the first test came back and Internal
18  Affairs can't tell me but Mr. Kitcho told me that he
19  tested positive.
20  Q  And let me stop you there. How -- when did
21  that first test come back? How long after?
22  A  Probably two weeks.
23  Q  Okay.
24  A  And I'm guessing.
25  Q  And they're not allowed to tell you their

**Page 12**

1  results?
2  A  Correct.
3  Q  But Mr. Kitcho did?
4  A  Yes.
5  Q  Okay.
6  A  Yes.
7  Q  Had they informed him what the results were?
8  A  Yes.
9  Q  Is that how he knew?
10  A  Yes.
11  Q  And what did he tell you?
12  A  He called me and he told me that he tested
13  positive for cocaine.
14  Q  Not the Molly?
15  A  And I said how do you test positive for
16  cocaine when you said that you thought you took Molly?
17  And he didn't have a response.
18  Q  Okay.
19  A  So at that time he elected to have the second
20  sample tested which takes another couple of weeks; and
21  the day the results came in, he was taken down to
22  Internal Affairs because that's the last straw is the
23  second test; and from what he told me is before they
24  told him the results of the second test he resigned.
25  Q  He resigned to the folks in Internal Affairs?

Wynter Whitley; Christopher Kitcho v.
Officer M.L. Hill, et al
Case 1:16-cv-03192-LMM   Document 57-3   Filed 11/01/17   Page 5 of 15
Richard A. Mason
July 18, 2017

Page 13

1  A  Correct.
2  Q  When did he -- when did he tell you that he
3  was resigning?
4  A  He told me after the fact that he resigned in
5  lieu of getting the results from the second test.
6  Q  And why was that?  Did he think they were
7  gonna come back positive?
8  A  He said I knew they were gonna be the same
9  and it just allowed me to get an extra check in between
10 the first sample and actually leaving.
11 Q  Okay.  What did you have to do to sort of
12 effectuate his resignation after he told you that?
13 A  Internal Affairs, Human Resources took care
14 of everything.  He was gone.
15 Q  Did he turn anything in to you?
16 A  No.
17 Q  Was he suppose to turn anything in to you?
18 A  Yes.  There is an entire operational
19 procedure on when you resign or retire on where what
20 equipment goes and what equipment needs to be turned
21 in.
22 Q  And what to your knowledge if you can still
23 remember did he have in his possession that he was
24 supposed to turn in to you?
25 A  We didn't know what equipment he actually

Page 14

1  had.  We just knew what he was mandated to turn in and
2  he turned in nothing.
3  Q  Okay.  Did you reach out to him to try to get
4  some of the things that he still had?
5  A  Yes, at least two times prior to the DeKalb
6  incident.
7  Q  How did you reach out to him?
8  A  I called him.
9  Q  Okay.  Did he answer?
10 A  Yes.
11 Q  And what was his response about turning it
12 in?
13 A  I'm busy.  I'll take care of it.  I'm on it.
14 Q  All right.  So let's turn to the DeKalb
15 incident.  Prior to this happening and outside of you
16 having reached out to him for the equipment, did you
17 have any other sort of meetings with Mr. Kitcho --
18 A  No.
19 Q  -- or had you talked to him?
20 A  No.
21 Q  Okay.  Tell me what happened the night of the
22 incident with DeKalb.  When did you get notified about
23 something going on with Mr. Kitcho?
24 A  It was early morning.  I don't know if it
25 started with a text or a phone call; but during a phone

Page 15

1  call that he made, he said that he was at a bar or club
2  in DeKalb County and that the police were harassing
3  him; and I said, okay, define harassing.  Well, they're
4  just messing with me and my girl.  I said, Chris,
5  leave.  Just walk away.  I said I don't know what
6  they're doing by harassing you; but if they're on duty,
7  they're working and they're right, leave.  Okay, okay,
8  okay.  Silence.
9      Calls me back.  Yeah, she's in handcuffs now.
10 I said, Kitcho, I said you're going to get in trouble.
11 I said leave her.  Bond her out tomorrow.  Get in your
12 car and leave.  I'm not leaving without her.  I said
13 you need to shut up and get in your car and drive away,
14 and we talked back and forth and he was -- obviously
15 he'd been drinking, but it wasn't connecting that he
16 needed to leave or something bad might happen.  Then I
17 get a text message -- and actually we have it.
18     (Defendant's Exhibit Number 1
19     was marked for identification.)
20 Q  And I'll -- so let's -- I'll mark this as
21 Defendant's Exhibit 1, and if you can just tell me what
22 this is and then we'll go back and then I can talk to
23 you about --
24 A  This is the last part of a text chain between
25 Kitcho and I, and the previous ones were actually given

Page 16

1  to DeKalb prosecution but apparently they don't have or
2  don't know where the case file is.  So this is all we
3  have left, and I actually dumped my phone with the
4  Cellebrite to see if they could be retrieved and they
5  can't because of the age.
6  Q  So Mr. Kitcho when he was on the phone with
7  you --
8  A  Uh-huh.
9  Q  -- gets off the phone and then texts you?
10 A  Uh-huh.
11 Q  How many times did he call you before he
12 started the text messages?
13 A  He called me at least twice.
14 Q  Okay.  And both those times you're testifying
15 that you told him to just sort of leave --
16 A  Walk away.
17 Q  -- and then go away?  And these start coming
18 in and what was the first text that you received?
19 A  I don't know exactly what it stated, but he
20 started the text chain saying I told them I was a cop
21 to try to save her and she's still in handcuffs and now
22 they're questioning me and I don't know what to do.
23 Q  What did you tell him -- did you respond to
24 that text?
25 A  I did.  I told him just walk away, just leave

## Page 17

1 and similar text until we get up to will I get locked
2 up for impersonating a police officer? And I said you
3 can. Why would you do that? And he responded not
4 sure. They're not letting me leave yet. I never said
5 I'm currently a police officer. I said I'm resigning.
6   Q   Let me go back. When he first called you,
7 did he ever say to you I told them that I was a police
8 officer?
9   A   The first call, no. The second call, no.
10 After this text, my phone rang again and it was a
11 sergeant from DeKalb who was asking me about Mr.
12 Kitcho.
13   Q   And what was your impression of why the
14 sergeant was asking you that?
15   A   The sergeant asked me if he was one of my
16 officers and I said he was; and he said, well, one of
17 my deputies encountered him and he's flashing a badge
18 and ID and claiming he's a cop and the badge looks a
19 little funny and we want to get to the bottom of it.
20 So I told him what had happened. I told him that he
21 had resigned either a week or two prior to this
22 incident. He should have turned in all of his City of
23 Atlanta issued equipment and identification. He hadn't
24 yet, and the sergeant said so is he or is he not a
25 police officer? And I said not at this time. He

## Page 18

1 resigned. He said okay.
2     I could hear Kitcho in the background, but it
3 was on the sergeant's phone that called me. It was an
4 unknown number. Shortly after that, I get a phone call
5 from a lieutenant. He said apparently we have one of
6 your officers. I said did you talk to the sergeant?
7 He said a little bit. So I went through the entire
8 story again. He said so you're telling me he is not
9 currently a police officer? I said that is correct. I
10 said is he going to make bond? The lieutenant said I
11 believe so. I said if he does or does not, do me a
12 favor, maintain possession of the ID and the badge and
13 I will get that from you as soon as possible.
14   Q   Was it your impression that Mr. Kitcho had
15 shown them the badge and the ID?
16   A   Yes. They said that he was flashing it
17 around.
18   Q   Okay. Was it your impression that he was
19 showing it to them in order to represent himself as an
20 officer?
21   A   Of course.
22   Q   Is that the impression you got from DeKalb
23 County Police when they called you that they believed
24 him at that time to be an officer?
25   A   Yes. I had a sergeant and a lieutenant

## Page 19

1 questioning he's representing himself as a police
2 officer. Is he?
3   Q   Okay. And so your thought was they're
4 calling you to confirm --
5   A   Correct.
6   Q   -- one way or the other?
7   A   Because he had a -- he had a badge that one
8 of the four numbers was actually broken off and they
9 were concerned with the validity of the badge and
10 that's another reason they called me.
11   Q   Tell me about the kind of badge you knew Mr.
12 Kitcho to have.
13   A   Well, everybody is issued their Atlanta
14 police badge and an officer will have four numbers on
15 it. Some officers choose to purchase a wallet badge
16 from Command or any other badge vendor that is flat and
17 will fit in your wallet. It's about $40; and in order
18 to purchase another badge, you have to present them
19 with your police ID and badge to prove that you are law
20 enforcement.
21   Q   Okay.
22   A   So a civilian cannot buy an Atlanta police
23 badge with numbers.
24   Q   And you're not sure when Mr. Kitcho bought
25 that badge?

## Page 20

1   A   No.
2   Q   And did the sergeant tell you that he had
3 flashed the badge or the lieutenant that called you?
4   A   Yes. They said he was walking around
5 flashing the badge.
6   Q   Have you heard of off market badge? Is that
7 what this is? Or aftermarket badge.
8   A   Aftermarket. If -- once you're issued a
9 badge, you can go to a variety of vendors who will
10 recreate an identical badge.
11   Q   If you are not a POST certified officer, not
12 working at a police department, if you flash the badge
13 whether it's off market or aftermarket or whatever and
14 you're not currently an officer, is that a crime?
15   A   Yes. If you flash credentials to suggest
16 that you are law enforcement, you will go to jail for
17 impersonating a police officer.
18   Q   Okay. After this happened or let's -- this
19 text here, what happened after your final text from
20 Mr. Kitcho?
21   A   After I received no more phone calls, I went
22 into work the morning obviously, Friday morning. I
23 contacted my major who was Barbara Cavender. She
24 contacted Homeland Security, and there was a
25 determination that based on the events that had

Wynter Whitley, Christopher Kitcho v.
Officer M.L. Hill, et al
Case 1:16-cv-05192-LMM   Document 57-3   Filed 11/01/17   Page 7 of 15
Richard A. Mason
July 18, 2017

Page 21

1 occurred and the fact that he had not turned any police
2 equipment in which he was obligated to do so that
3 Homeland Security would write a search warrant to
4 retrieve the police equipment from his apartment.
5   Q   Why does Homeland Security get involved in
6 this?
7   A   Homeland Security is the protector of the
8 police department, the eyes and the ears.
9   Q   Okay. And to your knowledge, what did --
10 what did they do or did they secure the search warrant?
11   A   They did. Investigator Matt Condland wrote
12 the search warrant. Major Cavender, myself, Sergeant
13 Pickard from Internal Affairs, and I don't know if
14 there was one other or if it was just us went to the
15 location, knocked at the door. His roommate I believe
16 was there, and we executed the search warrant.
17          (Defendant's Exhibit Number 2
18           was marked for identification.)
19   Q   I'm gonna show you what I've marked as
20 Defendant's Exhibit 2, and if you can tell me if you
21 can identify that.
22   A   This would have been the police report
23 completed by Investigator Condland after the execution
24 of the search warrant for the missing city property.
25   Q   Okay. Do you know whether you all got your

Page 22

1 property after they executed that search warrant?
2   A   We got boxes and boxes of police gear.
3   Q   How did he obtain all of that gear?
4   A   We received -- at that time we received a
5 $600 annual uniform allotment and you can purchase
6 whatever you feel you need.
7   Q   Okay. So he personally bought those items?
8   A   With the City's money.
9   Q   Okay.
10   A   The City gives you $600 as a credit. You go
11 to the store and you get police equipment.
12          (Defendant's Exhibit Number 3
13           was marked for identification.)
14   Q   Okay. I'm gonna show you Defendant's
15 Exhibit 3 and let me know if this is familiar to you as
16 well.
17   A   This is the report written by Investigator
18 Mark Olson. After we were on scene executing the first
19 search warrant, narcotics were discovered and a second
20 search warrant to search for narcotics was obtained.
21   Q   And so is this like a supplement to Mr.
22 Condland's report? Do they have similar numbers?
23   A   Yes. An 01 would refer to a supplemental
24 report under the same case number so they maintain a
25 link.

Page 23

1   Q   Okay. Outside of the items that were the
2 police issued items or the items that Mr. Kitcho can
3 buy through the police, what else was found in his home
4 to your knowledge?
5   A   Cocaine, marijuana, anabolic steroids,
6 needles, a gun. I believe that was it.
7   Q   Do you know whether or not charges were
8 brought against Mr. Kitcho for possession of those
9 items?
10   A   Yes.
11   Q   And who's handling that case to your
12 knowledge?
13   A   Fulton County.
14   Q   Is it still open?
15   A   It is.
16   Q   And I take it that Atlanta confiscated all of
17 that stuff and that it's being held in evidence --
18   A   Correct.
19   Q   -- or something like that? Have you spoken
20 with Mr. Kitcho about -- let's go back about the
21 incident happening outside the nightclub since his
22 arrest for -- well, let me ask you -- well, first was
23 he arrested for the possession of these items after the
24 execution of the search warrant?
25   A   Yes.

Page 24

1   Q   And have you spoken to him since that arrest?
2   A   No. Friday at 2:53 p.m. is when the
3 narcotics were discovered in his apartment and I sent
4 him a text we are done. Please do not contact me any
5 further, and I have not spoken to him since.
6   Q   Okay. Were you ever contacted by DeKalb
7 County on his impersonating an officer case?
8   A   Yes. There was a male ADA that asked for
9 some evidence and I gave them a complete list of the
10 text messages and spoke to them on a couple of
11 occasions and never heard from DeKalb again.
12   Q   Okay. And have you been in contact with
13 Fulton -- since you work with Atlanta, have you been in
14 contact with Fulton about his ongoing case?
15   A   Yes. They're planning a supression hearing
16 in August.
17   Q   Have you been subpoenaed for that?
18   A   Not officially.
19   Q   Okay.
20   A   They just call me and I show up.
21          MS. HARLOW: I have one other piece, guys,
22       and it's actually hanging on the copy machine and
23       that will be my last question. If you guys will
24       give me two seconds.
25          (Brief pause.)

**Page 25**

1     (Defendant's Exhibit Number 4
2     was marked for identification.)
3  BY MS. HARLOW:
4     Q   I'm going to label it as a composite exhibit
5  as Exhibit 4, and you can flip through that and quickly
6  tell me if you recognize it and what you recognize it
7  to be.
8     A   This is a copy of the Narcotics case file
9  that was created after the execution of the narcotics
10 search warrant on Mr. Kitcho.
11    Q   All right. Does this reflect the things that
12 were found in Mr. Kitcho's home?
13    A   Yes, both written and photos.
14    Q   So there's a property inventory sheet in
15 there?
16    A   Correct.
17    Q   And that will list everything that they
18 collected when they went in and executed the search
19 warrant?
20    A   The property control will list everything
21 maintained or seized and then the photographs may cover
22 other things such as used needles and trash that we
23 would not actually collect.
24    Q   Okay. And if you don't collect them, where
25 do they go?

**Page 26**

1     A   They stay in the trash.
2     Q   Okay. And so do you see photographs in
3  there? I just want to be clear.
4     A   Yes.
5     Q   And there's photographs of what just
6  generally you can name?
7     A   Drugs, needles, overall pictures of the
8  scene, steroids, cocaine, marijuana, IDs, mail.
9     Q   And you haven't talked to Mr. Kitcho about
10 this case?
11    A   No.
12    Q   I think I'm good. So there are some things
13 that were released to you?
14    A   Actually his City issued cell phone that he
15 never turned in when he left was found on scene and I
16 maintained custody of that and put it back in
17 circulation.
18    Q   Do you have everything now from Mr. Kitcho's
19 possession that you know about as far as the City
20 issued equipment?
21    A   We believe so, but you are not regulated on
22 what you purchase. So if it wasn't at his home, if it
23 was in his car or at his mother's or somewhere else, we
24 would never get it back.
25        MS. HARLOW: Okay. I think I'm good.

**Page 27**

1  They're gonna ask you a couple of questions.
2        CROSS-EXAMINATION
3  BY MR. GREENAMYRE:
4     Q   All right. I may jump around just a little
5  bit because I'm following up on hers.
6     A   Sure.
7     Q   So you were a lieutenant at the time --
8     A   Yes.
9     Q   -- of this? Okay. And what are your general
10 lieutenant, responsibilities of a lieutenant?
11    A   I was the commander of the Narcotics Unit to
12 oversee the entire operation.
13    Q   Okay. So there's one lieutenant for --
14    A   Correct.
15    Q   -- the Narcotics Division?
16    A   Yes.
17    Q   Okay. And was that across different police
18 zones or were you the lieutenant for Narcotics for a
19 given zone?
20    A   Citywide.
21    Q   Gotcha. And how many -- how many sergeants
22 would report to you --
23    A   Four.
24    Q   -- pursuant to that? Okay. And then how
25 many sergeants would be working in a given shift that

**Page 28**

1  would report to you?
2     A   Four.
3     Q   So four. Gotcha. And then what captains or
4  captain were you reporting to at that time?
5     A   We didn't have one then. Special Enforcement
6  section only had a major, which was Major Cavender.
7     Q   Okay. And what was her first name?
8     A   Barbara. Retired.
9     Q   You earlier said that it was I believe
10 miraculous that Kitcho had come over from Motor Vehicle
11 to Narcotics with you. What did you mean by that?
12    A   He had no narcotics experience. In order to
13 work Narcotics, you need the drive, the experience, the
14 know how, the ability and he had none of those
15 characteristics. Yet he was moved over there
16 unbeknownst to myself.
17    Q   Did he ask to move to Narcotics?
18    A   No. He just appeared on an order. When I
19 left Auto Theft, he came with me to Narcotics.
20    Q   So someone other than you or he asked that he
21 be moved to Narcotics?
22    A   Apparently. He may have asked. He didn't
23 ask me.
24    Q   Okay. You said after you had -- there was a
25 time where you suspected that he was under the

Wynter Whitley; Christopher Kitcho v.
Officer M.L. Hill, et al
Case 1:16-cv-03192-LMM   Document 57-3   Filed 11/01/17   Page 9 of 15
Richard A. Mason
July 18, 2017

Page 29

1 influence or was suffering from narcotics consumption?
2   A   Yes.
3   Q   When approximately was that?
4   A   Probably two to five weeks prior to him being
5 tested by Internal Affairs.
6   Q   Okay. And you recommended that he be given a
7 narcotics or, you know, a drug test at that time?
8   A   I told my sergeant to test him.
9   Q   Okay.
10   A   He did not. Unrelated to that incident,
11 three to five weeks later Internal Affairs called me
12 and said bring him down for a test.
13   Q   Right. So you told the sergeant to give him
14 a drug test and he basically talked his way out of that
15 drug test?
16   A   Correct.
17   Q   So when a, you know, superior asks that one
18 of his officers be given a drug test, that's not a
19 mandatory --
20   A   It was mandatory.
21   Q   It just didn't happen?
22   A   It just didn't happen.
23   Q   Okay. Was there any documentation of this --
24 would that be noted anywhere?
25   A   I did not relieve him of duty nor open a

Page 30

1 package. Based on his mannerisms after my
2 confrontation, he realizes that he screwed up and I
3 don't think it would ever happen again.
4   Q   Okay. So it wouldn't be reflected anywhere
5 on paper?
6   A   No.
7   Q   And then a couple of weeks later, there's an
8 anonymous tip that he is a cocaine user?
9   A   To the best of my recollection, Internal
10 Affairs stated they received a tip that he was using
11 narcotics at a club and they decided to call him down
12 to test him.
13   Q   Do you know what form that tip came in?
14   A   I don't, but in talking to Mr. Kitcho, he
15 made reference to a girlfriend or an ex-girlfriend that
16 was always complaining about him and probably made the
17 call, but I don't -- I have no confirmation.
18   Q   And you don't know who the author of --
19   A   No.
20   Q   -- that tip was?
21   A   No.
22   Q   Okay. Do you know whether it was written,
23 whether it was oral?
24   A   I do not.
25   Q   Okay. And then as a result of that anonymous

Page 31

1 tip, he was mandated that he be given a drug test?
2   A   Yes.
3   Q   Okay. And this time he didn't talk his way
4 out?
5   A   Can't. If you do not submit to the mandatory
6 drug test, you will be terminated.
7   Q   But the first time he --
8   A   He talked his way out of it. The sergeant
9 didn't take him down for the mandatory test so he was
10 okay.
11   Q   Do you know whether he tested positive for
12 anabolic steroids?
13   A   He told me he only tested positive for
14 cocaine. I don't know anything else.
15   Q   Are you -- do you know one way or another
16 whether the drug test would have screened for anabolic
17 steroids?
18   A   I believe so. I am not 100 percent sure.
19   Q   You believe that it would have --
20   A   I believe --
21   Q   -- screened for it?
22   A   -- it would have, but the levels in which you
23 must maintain are so elevated that, you know, if it had
24 been a little while, then he wouldn't test positive.
25   Q   That isn't Tour de France --

Page 32

1   A   No.
2   Q   -- doping?
3   A   No.
4   Q   Okay. And you said the testing provider was
5 Concentra?
6   A   Yes, on North Avenue.
7   Q   And that's a private provider?
8   A   The City uses Concentra.
9   Q   Okay. For all of their --
10   A   Blood work, police -- yes, all the blood
11 tests.
12   Q   And that's a separate -- if someone's, you
13 know, pulled over for example a DUI and they get a
14 blood screen, that would not go to Concentra, would it?
15   A   No.
16   Q   That would go to GBI?
17   A   They would go to Grady or the jail to have
18 the blood drawn.
19   Q   But once the blood is drawn?
20   A   Now I don't know where Concentra sends their
21 blood off. They draw it or they take the urine sample
22 and from there is goes off to a lab to be tested. I
23 don't know if it's GBI or another private entity.
24   Q   Are you aware of what Mr. Kitcho's POST
25 status is at this moment?

Case 1:16-cv-03192-LMM   Document 57-3   Filed 11/01/17   Page 10 of 15

Wynter Whitley, Christopher Kitcho vs.
Officer M.L. Hill, et al
Richard A. Mason
July 18, 2017

**Page 33**

1  A   No.
2  Q   Have you been involved in any kind of POST
3  investigation? Are you aware if there even is a POST
4  investigation?
5  A   No.
6  Q   Let me rephrase that because I asked you two
7  questions at that time. So are you aware of any POST
8  investigation?
9  A   I am not, no.
10 Q   Okay. And no involvement?
11 A   No.
12 Q   So forgive potentially, you know, dense
13 questions. I am trying to get this figured out. So
14 with the search warrant execution, there were actually
15 two warrants?
16 A   Yes.
17 Q   Okay. So the first one you're looking for
18 police equipment?
19 A   Yes.
20 Q   Okay. And how do you decide to get such a
21 warrant for, to get this police equipment?
22 A   Based on the mandated -- based on the mandate
23 that upon resignation or retirement, you must turn in
24 your police equipment, followed by the fact that he
25 presented himself as a police officer while not being,

**Page 34**

1  a decision was made to retrieve the police equipment.
2  Q   In Exhibit 4 which you reviewed earlier, is
3  the warrant, that original warrant present?
4  A   I see the Narcotics warrant. I don't see a
5  copy of Homeland Security's warrant as I briefly look
6  through it.
7  Q   Would there still be a record of that
8  warrant?
9  A   Yes.
10 Q   Okay. Was that in the materials that you
11 shared with attorneys Harlow and Smith?
12 A   Not if it's not in here.
13 Q   Okay.
14 A   This is simply the Narcotics case file.
15 Q   Uh-huh.
16 A   Homeland I would hope would have their
17 separate case file.
18 Q   Okay.
19 A   One would think that both would contain the
20 same but obviously not.
21 Q   If you turn to I think what is the second
22 page of the second warrant in Exhibit 4. I have a
23 separate copy. I think it's the next page after that.
24 No. Maybe a couple. I can just show you. I'll tell
25 you what we'll mark that as Plaintiff's 1.

**Page 35**

1      (Plaintiff's Exhibit Number 1
2      was marked for identification.)
3  A   Okay.
4  Q   Second page of this at the bottom looking at
5  Policy 4.1.2 --
6  A   Uh-huh.
7  Q   -- is this the policy regarding turning in
8  police equipment?
9  A   Yes.
10 Q   And was Kitcho's failure to abide by this
11 policy the reason for the search warrant, the first
12 search warrant?
13 A   Primarily it was due to the fact that he was
14 still representing himself as a police officer more so
15 than just failure to follow and comply and turn in
16 equipment.
17 Q   Prior to the execution of the search warrant,
18 you mentioned some communications between you and
19 Kitcho regarding returning APD materials?
20 A   Yes.
21 Q   You said these were two phone calls?
22 A   Phone calls or text messages, yes.
23 Q   Okay.
24 A   With responses.
25 Q   Are you -- are there -- you think phone calls

**Page 36**

1  and text messages?
2  A   Either or.
3  Q   Okay.
4  A   But he responded. If it was a call, he
5  answered. If it was a text, he responded.
6  Q   Right. What was the substance of those?
7  What specifically did you say, did you ask for?
8  A   I told him that he needed to turn in his
9  equipment and he said, yeah, I'll get around to it.
10 I've been busy.
11 Q   And was that with reference to, you know,
12 this policy or just generally turn in your equipment?
13 A   Both.
14 Q   What are the rules for -- you know, I see
15 some rules in, you know, 4.1.2, but I don't see
16 anything with regard to turning in, you know, equipment
17 purchased via the APD subsidy that you described
18 earlier. Are there rules regarding that?
19 A   Yes. The -- at the time $600 per year can be
20 used to purchase uniform shirts, gun belts, badges,
21 epaulet pins, any of what I'm wearing now.
22 Q   Uh-huh. And are there written rules
23 describing you turning those materials in upon
24 termination?
25 A   Well, the problem was he didn't turn in

Page 37

1  anything under 4.1.2 so we went back to get that; and
2  while we were there since there was a lot more than
3  contained within 4.1.2, we collected that as well.
4    Q   So just to be clear, are there any -- was he
5  breaking -- was Christopher Kitcho breaking any rules
6  by not turning in, you know, say a raincoat he had
7  bought with the, you know, $600 subsidy? Are you aware
8  of any rule that would --
9    A   No. According to this, no.
10   Q   Okay. So not breaking any rules by not
11 turning in materials bought with the, you know, $600
12 per year subsidy?
13   A   Correct. You're outside the scope of what's
14 mandated.
15   Q   Uh-huh. But he, for example, didn't turn in
16 his two uniforms. That is written down in 4.1.2?
17   A   He didn't turn in a badge or an ID or his
18 uniforms, correct.
19   Q   And there's, you know, as another example he
20 would not be obligated to turn in the aftermarket badge
21 that he had purchased that we discussed earlier?
22   A   He could keep it as a momento; but if he were
23 to display it, he would be arrested, absolutely.
24   Q   So for this first search warrant looking for
25 evidence of him impersonating an officer --

Page 38

1    A   Uh-huh.
2    Q   -- and then also confiscating any material
3  related to, you know, his police equipment --
4    A   Uh-huh.
5    Q   -- that's the purpose of that first search
6  warrant?
7    A   Correct. He went beyond policy when he
8  represented himself as a police officer. So,
9  therefore, it would be as if a citizen were
10 representing himself as a police officer and we were to
11 execute a warrant if it was a black t-shirt with police
12 on it, we would take it.
13   Q   Right. And you brought a -- you and the
14 other officers that were there serving that first
15 search warrant brought a K-9 to that --
16   A   No.
17   Q   Okay.
18   A   This search warrant, yes. This is Number 2.
19 It would be against procedure to bring a dog on a
20 nonnarcotic search warrant.
21   Q   If I -- take a look at Exhibit 4.
22   A   If you're referring to the first search
23 warrant, that was drafted by Matt Condland. Olson was
24 the second one.
25   Q   I want to direct your attention to the second

Page 39

1  paragraph of the first page of Exhibit 4.
2    A   Uh-huh.
3    Q   Will you read that?
4    A   On 8/28/2014 --
5    Q   You can read it to yourself.
6    A   Okay.
7    Q   So this is saying that at 8/28 at 3:30 Olson
8  obtained a search warrant and brought a K-9 to Chris
9  Kitcho's residence?
10   A   Yes.
11   Q   Okay. Does that, all that sound accurate to
12 you?
13   A   Yes.
14   Q   Okay.
15   A   But this was executed after the previous.
16   Q   Okay. Where were the narcotics found in
17 Kitcho's apartment?
18   A   There was cocaine and marijuana in a humidor
19 on his dresser to the left of the TV. There were
20 steroids in the nightstand to the right side of the bed
21 I think on top and in the pull out drawers, and without
22 reading that's as much as I would remember.
23   Q   What kind of police gear would you expect to
24 find in a humidor?
25   A   Believe it or not, I was finding these pins

Page 40

1  strewn throughout the entire house.
2    Q   Okay. And were those pins something that
3  would have been mandated to be --
4    A   After impersonating a police officer, yes.
5  Anything police related was fair game.
6    Q   I want to direct your attention to what I
7  believe is the first page of the second warrant and in
8  the lower left hand --
9    A   Uh-huh.
10   Q   -- corner, there's a signature?
11   A   Yes.
12   Q   Whose signature is that?
13   A   Mine.
14   Q   Okay.
15   A   I am required to initial the bottom left
16 corner of every page of every search warrant Narcotics
17 executes.
18   Q   So it's your understanding that Kitcho is
19 currently being prosecuted by Fulton County for the
20 some of the materials that were found in his apartment
21 pursuant --
22   A   Yes.
23   Q   -- to that second, first and second search?
24   A   Second, yes.
25   Q   Have you -- what communications have you had

**Page 41**

1  with the prosecutor in that case?
2    A    They called me last week and said that there
3  was a supression hearing probably in August and that
4  they would get back to me when I needed to appear.
5    Q    Okay. Any other communications you've had
6  with them?
7    A    No, other than they called me to request the
8  case file.
9    Q    Okay.
10   A    So Olson emailed it to myself and Fulton
11 County. I just thought it would benefit you guys so I
12 brought it here.
13   Q    Much appreciated. So after 2:53 on the
14 Friday of the search warrants being executed the same
15 day hours after he had been arrested --
16   A    Uh-huh.
17   Q    -- after that point in time, have you talked
18 to Kitcho at all about his arrest for impersonation?
19   A    No.
20   Q    Okay. All right. So again some things that
21 you've already spoken about but I just want to clear up
22 a sequence from regarding the night that Kitcho was
23 arrested.
24   A    Okay.
25   Q    First you get a call from Kitcho?

**Page 42**

1    A    Yes.
2    Q    He calls your cell phone?
3    A    Uh-huh.
4    Q    Okay. And then how long would you say that
5  conversation lasts?
6    A    Less than a minute.
7    Q    Okay. Do you have any recollection of the
8  substance of that conversation?
9    A    He just mentioned that he and his girl were
10 at a bar in DeKalb County and that he was being
11 harassed by the deputies.
12   Q    Okay. So at that time he's saying, you know,
13 they're harassing me?
14   A    Uh-huh.
15   Q    Okay. You get a second call from him?
16   A    Yes, and I don't know if it was two calls and
17 texts or a call and a text and a call and some texts;
18 but throughout the next probably 30 or 40 minutes, I
19 received calls and text messages from him.
20   Q    So you would say you got at least two calls
21 from --
22   A    From Kitcho.
23   Q    -- Chris?
24   A    Uh-huh.
25   Q    Okay. And then after the second call, you

**Page 43**

1  get a text message from him?
2    A    Yes.
3    Q    Okay. So the two calls and then you get a
4  text message?
5    A    Correct. And there may have been texts in
6  between the calls --
7    Q    Uh-huh.
8    A    -- but this was the last communication I had
9  with Mr. Kitcho right here.
10   Q    And for the record, you're referring to --
11   A    The text message.
12   Q    -- Defendant's Exhibit 1?
13   A    Yes.
14   Q    So the sequence is call, you know, they're
15 harassing me and my girl. Another call. Then, you
16 know, a series of text messages and maybe these are
17 overlapping --
18   A    Yes.
19   Q    -- but he says am I gonna get locked up for
20 impersonating a policer officer? I never said I'm
21 currently a police officer. I said I'm resigning?
22   A    Correct.
23   Q    And then after that you get a call from the
24 DeKalb County sergeant --
25   A    Yes.

**Page 44**

1    Q    -- who says, you know, is this guy an officer
2  or not?
3    A    Correct.
4    Q    Okay.
5    A    And after that I get one from the lieutenant.
6    Q    So the DeKalb County sergeant to your
7  understanding understood Chris Kitcho to represent
8  himself as a current DeKalb County or current Atlanta
9  police officer?
10   A    Yes.
11   Q    And then at 2:53 the next, I guess the day,
12 the same day but, you know, during daytime 2:53 p.m.,
13 you say, you know, we're done and that's the last
14 contact you've had with Chris?
15   A    That was after the narcotics were found in
16 his apartment.
17   Q    Okay. And that was after the second search
18 warrant?
19   A    First.
20   Q    Okay. So in between the first and second
21 search warrant?
22   A    Correct. While on the first search warrant,
23 drugs were located. The scene was frozen. It now
24 becomes a Narcotics event. Second search warrant's
25 written. In between one and two is when I sent him

Wynter Whitley, Christopher Kitcho v.
Officer M.L. Hill, et al
Case 1:16-cv-03192-LMM   Document 57-3   Filed 11/01/17   Page 13 of 15
Richard A. Mason
July 18, 2017

Page 45

1  that text. Of course, he was incarcerated and probably
2  didn't get it till the following week, but ultimately
3  he did and he has not called me.
4      Q   Who was responsible for giving Kitcho's
5  performance reviews?
6      A   His sergeant.
7      Q   And were those reviews then submitted to you
8  for approval?
9      A   No. They would have gone to me to be
10 submitted to Human Resources.
11     Q   But you would have reviewed them before
12 sending them to Human Resources?
13     A   I probably did, yes. He probably was rated
14 highly effective. He was great at undercover in the
15 clubs, believe it or not.
16     Q   Would any of the -- some of the
17 characteristics that you ascribed of him earlier were,
18 for example, flighty. Would those be reflected in his
19 performance reviews?
20     A   No. There's a very finite list of criteria
21 that are on the annual reviews. It doesn't cover
22 something like that. It could have been entered by a
23 sergeant's notes, but that would not have been.
24     Q   In Policy 4.1.2 and going on to subsequent
25 ones, are you aware of any time period prescribed in

Page 46

1  those regulations?
2      A   It doesn't make reference to time.
3      Q   Are you aware of any other rules regarding,
4  you know, turning in equipment generally other than
5  those rules?
6      A   No.
7      Q   Okay. You said earlier that in a text that
8  is not included in Exhibit 1 that Chris said I told
9  them I was a cop?
10     A   It was either a text or on the phone, but he
11 openly admitted, yeah, I told them I was a cop. I got
12 my stuff, and I think I've fucked up.
13     Q   And you said you submitted or at least what I
14 heard from the first testimony was that that was in a
15 text and that was something that you sent over to
16 DeKalb County?
17     A   The entire chain would have been sent to
18 DeKalb, correct.
19     Q   Okay. And how would you have done it?
20     A   I would have screenshotted and emailed to
21 whomever it was at DeKalb.
22     Q   Okay. So then even if DeKalb would have lost
23 the case file as you speculated earlier, you would
24 still have a copy of that email?
25     A   Theoretically somewhere in cyberspace, the

Page 47

1  City may be able to recover that.
2      Q   Have you looked for that at all?
3      A   No. I just -- it would be beyond my scope.
4  It would be something that AIM would have to get into.
5  I just tried to dump my phone.
6      Q   You couldn't look through your email history?
7      A   No, it doesn't go back that far.
8      Q   Your email history won't let you go back to
9  2014?
10     A   No, but they can do it.
11     Q   Okay.
12     A   I can store up to between 1000 and 1500 in
13 any category before it locks up my system. So you have
14 to constantly delete the deleted and delete different
15 files, but it's maintained up in cyberspace somewhere
16 on the server within Atlanta.
17     Q   A thousand to 1500 whats?
18     A   Emails. Whether they're deleted or whatever,
19 you have to go back through. If I delete an email, it
20 goes into a deleted folder. At some point I have to
21 delete the deleted folder to make more room for deleted
22 emails.
23     Q   So your in-box, for example, can only hold --
24     A   Correct.
25     Q   -- 1000 to 1500 emails at a given time?

Page 48

1      A   Correct.
2      Q   What email client do y'all use?
3      A   What is it? Outlook.
4      Q   Did y'all get a special version of Outlook?
5      A   Potentially. The best 1988 had to offer.
6      Q   Yeah. Okay. So let's talk about the cell
7  phone for a second. So do you have the same cell phone
8  that you were using?
9      A   Uh-huh.
10     Q   And that's APD issued?
11     A   No.
12     Q   That's your personal?
13     A   That's personal.
14     Q   That's an iPhone?
15     A   I5.
16     Q   Okay. And so that text message you said you
17 weren't able to find going back; correct?
18     A   Correct.
19     Q   Okay. And you said you did something
20 Cellebrite?
21     A   Cellebrite is a system that you can extract
22 all of the information from a phone and put it into a
23 printed format and I actually took my phone to homicide
24 or cyber crime people and they tried to extract; and at
25 that age, it's like a computer where it will overwrite

Page 49

1 itself with certain messages and it had already
2 overwritten.
3 Q   Okay. Who's your cell phone provider for
4 your personal cell phone?
5 A   Sprint.
6 Q   Do you have a iCloud account?
7 A   I don't know.
8 Q   Do you --
9 A   I don't use it.
10 Q   Did you ever buy or have any apps on your
11 personal cell phone?
12 A   No.
13 Q   You have no apps on your personal cell phone?
14 A   If it's free, I might have it. I might have
15 one or two things on there, but no. You can look at it
16 if you want. I don't -- it's made to talk on.
17 Q   So we see --
18 A   Angry Birds.
19 Q   For the record, we've got a Facebook app. We
20 got an Angry Birds app. Okay. So we do have some apps
21 on that phone.
22 A   All free.
23     MR. GREENAMYRE: Hold on.
24     (Off-the-record discussion.)
25 BY MR. GREENAMYRE:

Page 50

1 Q   Just a few more disjointed questions for you.
2 First question about disorderly conduct, is it legal to
3 arrest someone for using profanity in public?
4 A   From my experience, it's not done.
5 Therefore, I would not do it. That sounds like a First
6 Amendment violation to me. So I would say no.
7 Q   Obviously there could be, you know, some
8 context where you use profanity and you're also being
9 disorderly, you know --
10 A   Correct.
11 Q   -- but just using profanity in public alone?
12 A   Hell, no.
13 Q   At the time that search warrants one and two
14 were executed on Christopher Kitcho's apartment, he had
15 a roommate?
16 A   Yes.
17 Q   It was a two bedroom apartment?
18 A   Yes.
19 Q   That roommate was an Atlanta police officer?
20 A   Yes.
21 Q   Has that Atlanta police officer been
22 subjected to any criminal investigation?
23 A   He was actually relieved of duty and urine
24 tested. When he came back positive (sic), he was put
25 back in full active duty based on the fact that drugs

Page 51

1 were recovered from the apartment even though he just
2 was a roommate.
3 Q   I'm sorry. I may have not understood you.
4     MR. SMITH: Came back positive?
5     THE WITNESS: Came back negative.
6 A   Since drugs were recovered from the
7 apartment, he was tested. Results were negative. He's
8 back in full service, full employment. I may have
9 misspoken.
10 Q   But what you said the second time makes more
11 sense. All right. You spoke to DeKalb County police
12 officers on the night in question and you said a
13 sergeant and a lieutenant, and they did not personally
14 observe him displaying a badge; correct?
15 A   I do not know.
16 Q   Okay. Did they say that I saw him show a
17 badge?
18 A   I don't recall hearing those words from them.
19 Q   Okay. When -- jumping around one more time.
20 When Chris Kitcho got his drug test when he, you know,
21 finally couldn't talk his way out of it, they came to
22 his house to get him so he could take the drug test?
23 A   I think we did, yes.
24 Q   Okay. And they took from him his badge and
25 his gun and his ID at that time?

Page 52

1 A   A badge, an ID, and a weapon, yes.
2 Q   Okay. Was that badge the, you know, the
3 official APD badge or was that an aftermarket badge?
4 A   They're so close we can't tell. It appeared
5 to be an original.
6 Q   Okay. And were those materials given back to
7 him while he was on administrative suspension?
8 A   No.
9 Q   So he would have not turned those in to you,
10 you know, prior to the execution of the search warrant
11 because you would have already had those?
12 A   Correct.
13     MR. GREENAMYRE: That's it unless you guys
14     have more.
15     REDIRECT EXAMINATION
16 BY MS. HARLOW:
17 Q   I just want to clear up this first page of
18 Exhibit 4 because I've had experience with police
19 reports and sometimes they confuse me with dates and
20 times. So this first paragraph says 8/29 at
21 approximately 13:30 hours which is 1:30 on the 29th;
22 right? And the second paragraph says 8/28 at
23 approximately 15:30 hours which would be 3:30 on the
24 28th?
25 A   Uh-huh.

Wynter Whitley, Christopher Kitcho v.
Officer M.L. Hill, et al
Case 1:16-cv-05192-LMM   Document 57-3   Filed 11/01/17   Page 15 of 15
Richard A. Mason
July 18, 2017

Page 53

1  Q  Do you know if these are right based on your
2  testimony today and what we've discussed about the day
3  of the incident with respect to time frames for the
4  first and second search warrants?
5  A  The search warrant for narcotics was signed
6  at 15:05 hours on the 29th of August.
7  Q  Okay. So if this says 8/28, should that be
8  the 29th?
9  A  It should be.
10  Q  So the second paragraph on the first page of
11  Exhibit 4 has a bit of a typo on it. So it's the 29th,
12  2014 at 15:30 hours is when the Narcotics search
13  warrant was executed?
14  A  Correct.
15  Q  All right. So that's a couple of hours after
16  the Homeland Security search warrant?
17  A  Maybe 45 minutes, yes.
18  Q  Okay. And you said Mr. Condland is
19  supervising that?
20  A  Matt Condland is a detective in Homeland
21  Security who secured the first warrant.
22  Q  And you said there was a file for that. He
23  should have that file?
24  A  He should have.
25  Q  And that's gonna relate for Mr. Kitcho's

Page 54

1  arrest for the impersonating an officer?
2  A  Yes. The affidavit should explicitly cover
3  that for probable cause to go in to get the gear.
4     MS. HARLOW: Okay. That's all I have. Thank
5  you very much.
6     MR. GREENAMYRE: Thank you. Appreciate it.
7     (Deposition concluded at 10:50 a.m.)
8     (Signature waived.)

Page 55

CERTIFICATE

GEORGIA:
WALTON COUNTY:

I hereby certify that the foregoing deposition was taken down, as stated in the caption, and that the questions and answers thereto were reduced to typewriting under my direction; that the foregoing pages represent a true and correct transcript of the evidence given upon said hearing; that I am in compliance with O.C.G.A. 9-11-28(c) and 15-14-37(a) and (b); and I further certify that I am not of kin or counsel to the parties in the case, am not in the regular employ of counsel for any of said parties, nor am I in any way interested in the result of said case.

This the 1st day of August 2017.

_____
Patricia M. Moon, B-1078
Certified Court Reporter and
Notary Public, State at Large
Commission Expires 12/13/19

Page 56

DISCLOSURE

STATE OF GEORGIA
COUNTY OF WALTON

DEPONENT:                RICHARD A. MASON
DATE OF DEPOSITION:      JULY 18, 2017

Pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:

I am a Georgia Certified Court Reporter.

I am not disqualified for a relationship of interest under the provisions of O.C.G.A. Section 9-11-28(c).

I am here as a representative of Moon Reporting Services, Inc.

Moon Reporting Services, Inc. was contacted by the DeKalb County Law Department to provide court reporting services for this deposition.

Moon Reporting Services, Inc. will not be taking this deposition under any contract that is prohibited by Georgia law.

_____
Patricia M. Moon, B-1078
Certified Court Reporter